**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **SOUTHEAST MISSOURI HOSPITAL,** | ) | |
| **on behalf of itself and all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case no. 1:07cv0031 TCM** |
| | ) | |
| **C.R. BARD, INC.; TYCO** | ) | |
| **INTERNATIONAL (US), INC.; and** | ) | |
| **TYCO HEALTH CARE GROUP, L.P.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

Pending in this action is a motion to dismiss filed by defendants Tyco International (US), Inc., and Tyco Health Care Group, L.P. (collectively referred to as "Tyco") [Doc. 60], a motion to dismiss filed by defendant C.R. Bard, Inc. ("Bard") [Doc. 62], and a motion for leave to file a second amended complaint [Doc. 98]. Each motion is opposed.

## Background

The relevant factual allegations in the first amended complaint are assumed, for purposes of the two motions to dismiss, to be accurate and are as follows.

Southeast Missouri Hospital ("Plaintiff") purchases urological catheters from Bard and Tyco. (Compl.[1] ¶¶ 13, 15.) Urological catheters may include standard Foley catheters, infection control Foley catheters, and urethral catheters. (Id. ¶ 32.) The first two types of urological catheters are sold individually as "strips" for between $2 and $3 or in a package

---

[1] Unless otherwise indicated, citations to the complaint are to the amended complaint.

as "trays" for between $3 and $12.  (Id. ¶ 34.)  The first type, the standard Foley catheter, has a common side effect of urinary tract infections; the second type, the infection control Foley catheter, was created to combat these infections.  (Id. ¶¶ 35-36.)  These two types are priced differently, but are interchangeable "and the prices of each have substantial cross elasticity."[2]  (Id. ¶ 38.)

Bard and Tyco manufacture infection control Foley catheters, as do other companies, including Rochester Medical Corporation ("Rochester").  (Id. ¶ 39.)  The catheter manufactured by Rochester has been "clinically proven and designed to reduce urinary tract infections . . . ."  (Id.)  Bard does not manufacture an infection control urethral catheter.  (Id. ¶ 42.)  Rochester does.  (Id.)

In addition to urological catheters, Bard's product lines include products in the fields of urology, oncology, and vascular and speciality surgery.  (Id. ¶ 41.)  Its revenues in 2006 exceeded $2 billion.  (Id.)  Tyco's product lines include more than 100,000 health-related products.  (Id.)  Its revenues in 2006 exceeded $9.6 billion.  (Id.)  Additionally,

> [a]t all times, . . . Bard and Tyco have enjoyed overwhelming market power in the market for Urological Catheters with an aggregate U.S. market share exceeding 90%.  Defendant Bard alone controls approximately 90% of the market for Standard Foley Catheters sold in the United States, and together with Defendant Tyco, they control in excess of 90% of that market. Rochester, despite developing a technological [sic] innovative Infection Control Foley Catheter with demonstrated efficacy in clinical trials, controls less than 1% of the three sub-markets [or types of urological catheters]. Therefore, Defendant Bard enjoys monopolistic and market power in the relevant market and sub-markets because it has substantial control over pricing

---

[2]"Cross elasticity of demand is defined as '[a] relationship between two products, usually substitutes for each other, in which a price change for one product affects the price of the other.'" **Ferguson Med. Group, L.P. v. Missouri Delta Med. Ctr.**, 2006 WL 2225454, *2 n.1 (E.D. Mo. 2006) (alteration in original).

and the power to exclude competition.  Defendants Tyco and Bard together possess even greater power.

(Id. ¶ 42.)  Specifically, "Bard has an 84% share of the overall market for Urological Catheters in the United States."  (Id. ¶ 79.)  "After 1997, Bard has controlled approximately 96% of the U.S. market for Infection Control Catheters."  (Id. ¶ 80.)  "Since approximately 2001, Bard has controlled approximately 75% of the U.S. market for Standard Foley Catheters."  (Id. ¶ 81.)

Plaintiff defines the relevant geographic market as the United States for the nationwide class and Missouri for the Missouri subclass.  (Id. ¶¶ 21-22, 83.)

The market for urological catheters is characterized by high barriers to entry, including substantial costs for research and development; the standardized purchasing practices of hospitals; the lack of access to distribution channels; and "[Bard's and Tyco's] exclusionary agreements."  (Id. ¶ 43.)  Perceiving Rochester to be a threat, Bard and Tyco "embarked upon an anticompetitive scheme to maintain their market power and preserve their monopoly profits."  (Id.)  Bard's and Tyco's anticompetitive, monopolistic strategy included "using illegal exclusive dealing and bundling arrangements in their contracts with Group Purchasing Organizations ("GPOs") and integrated delivery networks ("IDNs") (which are groups of hospitals that band together for contracting purposes)."  (Id. ¶ 48.)  The largest of the GPOs are Novation L.L.C. and Premier, Inc.  (Id. ¶ 49.)

". . . [M]edical equipment manufacturers and suppliers provide GPOs . . . with hefty 'administrative fees' and other forms of remuneration in exchange for delivering substantial market share to monopolistic medical devices manufacturers such as Defendants Bard and

Tyco. . . . These multi-million dollar payments, as well as other fees and incentives, give companies such as Defendants Bard and Tyco significant economic leverage over GPOs and hospitals." (Id. ¶ 50.) Specifically, Bard and Tyco induce "GPOs and IDNs to enter into 'committed,' 'sole-source' or 'dual-source' exclusive dealing contracts." (Id. ¶¶ 52, 57.) A committed contract requires a GPO member hospital to purchase its urological products only from Bard and Tyco. (Id. ¶ 58.) If the member hospital does not, Bard and Tyco "in combination, concert and conspiracy with [the] GPO" and with IDNs force the hospital to pay "significantly higher prices for other urological products covered under the contract," expels or threatens to expel the hospital from the GPO, and withdraws product availability, business opportunities, or financial incentives. (Id. ¶¶ 58, 60, 71, 72.)

A dual-source contract "effectively" creates a duopoly that requires a hospital to choose to enter an exclusionary agreement with Bard or Tyco. (Id. ¶ 59.) Bard and Tyco also "use[] market-share maintenance compliance pricing contracts or loyalty discounts that GPOs enforce[], conditioning the receipt of rebates, prices or discounts on a hospital purchasing a specified percentage of Urological Catheters from [Bard and Tyco]." (Id. ¶ 52.) And, they "use[] penalty provisions to maintain and extend their market power over Urological Catheters." (Id.) Thus, "a hospital is charged a much higher price for its Urological Catheters unless it purchases both a significant, specified percentage of Urological Catheters from Defendants Bard and Tyco (generally 90%) and a significant, specified percentage (generally 90%) of other unrelated products." (Id. ¶¶ 52, 68.) "The purpose of these financial penalties [is] to leverage Bard's and Tyco's position in Urological Catheters to fight 'price erosion' for their other products." (Id. ¶ 68.) Other, smaller, equally

efficient companies that do not offer the varied product lines of Bard and Tyco, e.g., Rochester, cannot profitably compete against Bard's and Tyco's "exclusive dealing provisions and contractual penalties." (Id. ¶ 69.) And, because hospitals standardize their purchasing, a requirement that a hospital purchase 90% of its products from a vendor "is tantamount to a commitment to buy 100%." (Id. ¶ 65.)

Plaintiff further alleges that Bard and Tyco condition the price paid by GPO or IDN members for their urological products on the requirement that "the member agree to fill all, or nearly all, of its urological product needs" with their products. (Id. ¶ 63.) This requirement is included in Bard's and Tyco's long-term "market-share maintenance" contracts with GPOs and IDNs. (Id. ¶¶ 62, 66.) Again, the percentage of urological products that a member is permitted under these contracts to purchase from Bard's and Tyco's rivals is "usually about 10%." (Id.) If a member did not comply with this purchase requirement the member "could forfeit substantial rebates and/or pay enormous penalties." (Id. ¶ 64.) The penalties could include (i) having to either pay higher prices for Bard's and Tyco's urological products or repay past rebates given for prior purchases or (ii) losing post-purchase rebates for their purchases. (Id. ¶¶ 64, 71.)

Additionally, Bard "in concert, combination, and conspiracy with GPOs have [sic] sought to maintain [its] monopoly power in the Urological Catheter Markets by engaging in a campaign of disparagement and misinformation about the urological products manufactured by competitors." (Id. ¶ 53.) Plaintiff provides a sample of such a campaign about products manufactured by Rochester. (Id. ¶ 54.)

Bard's and Tyco's above-described conduct "stifle[s] competition in the Urological Catheter Markets and has . . . a direct, substantial, and adverse effect on competition by monopolizing the Urological Catheter Markets, artificially creating barriers to entry in the Urological Catheter Markets, and foreclosing competition on the basis of price and performance." (<u>Id.</u> ¶ 85.) But for this illegal conduct, Plaintiff and the class members it seeks to represent "would have been able to purchase superior Urological Catheters at lower prices." (<u>Id.</u> ¶ 86.)

In Count I of its amended complaint, Plaintiff alleges that Bard's and Tyco's agreements with GPOs and IDNs that require hospitals to purchase urological catheters from them, which condition discounts, rebates, or lower prices on a hospital's agreement to purchase from them a specified percentage of urological catheters, and which penalize hospitals if they purchase other, unrelated products from another vendor are an unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In Count II, Plaintiff alleges that Bard and Tyco have monopoly power in the Urological Catheter Market and wrongfully maintain this power by entering into the agreements outlined in Count I. This power violates Section 2 of the Sherman Act, 15 U.S.C. § 2. In Count III, Plaintiff further alleges that agreements Bard and Tyco have entered into with GPOs and IDNs condition the availability of their "products and/or discounts on the condition that the members of the GPOs and IDNs refrain from purchasing competing products, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14[,]" thereby depriving Plaintiff and others of the benefits of competitive pricing. (<u>Id.</u> ¶ 111.)

Plaintiff alleges in Count IV that the agreements and behavior at issue in the preceding Counts violates Missouri's Fair Merchandising Practices Act, Mo.Rev.Stat. § 407.020, in Count V that the same violates Missouri's Antitrust Law, Mo.Rev.Stat. §§ 416.031-161, and in Count VI that the same is a reflection of a civil conspiracy.

As noted above, Bard and Tyco separately move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss each count against them. Their specific arguments are addressed below. As also noted above, Plaintiff moves to again amend its complaint. The second amended complaint adds two parties as plaintiffs; expands the temporal scope of the class; modifies the relevant product markets; and adds a state-law claim.

## Discussion

Standard of Review. The parties disagree about the effect of the Supreme Court's decision in **Bell Atlantic Corp. v. Twombly**, 127 S.Ct. 1955 (2007), on this Court's review of the sufficiency of Plaintiff's Sherman Act and Clayton Act allegations to state a claim.

The specific question in **Bell Atlantic** was whether a class action alleging that "major telecommunications providers engaged in parallel conduct unfavorable to competition, *absent some factual context suggesting agreement, as distinct from identical, independent action*" sufficiently stated a claim under Section 1 of the Sherman Act[3] ("Section 1"). **Id.** at 1961 (emphasis added). Plaintiff described the parallel conduct as "making unfair agreements with

---

[3]Section 1 reads, in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1.

[competitive local exchange carriers] for access to [incumbent local exchange carriers'] networks, providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage the [competitive local exchange carriers'] relations with their own customers." **Id.** at 1962 (alterations added).  The incumbent local exchange carriers were motivated to thwart the competitive efforts of the competitive local exchange carriers, and this motivation led to a conspiracy.  **Id.** at 1962-63.

Examining Plaintiff's allegations in the context of the requirement of Rule 8(a)(2) of the Federal Rules of Civil Procedure, the Court concluded, in part:

> Without more, parallel conduct does not suggest conspiracy, *and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality*.  Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

> The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement"[4] possess enough heft to "sho[w] that the pleader is entitled to relief."  A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.

**Id.** at 1966 (quoting Rule 8(a)(2)) (alteration in original) (emphasis added).  In other words, a complaint must include "enough facts" to "nudge . . . [the] claims across the line from conceivable to plausible."  **Id.** at 1974 (alterations added).  "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim of relief that is plausible on

---

[4]Rule 8(a)(2) requires that a complaint include "a short and plan statement of the claim showing that the pleader is entitled to relief . . . ."  (Alteration added.)

its face." **Id.** (alteration added).  If a plaintiff's allegations fail to satisfy this need, dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate.[5]  **Id.**  See also **Stalley v. Catholic Health Initiatives**, 509 F.3d 517, 521 (8th Cir. 2007).

Count I: Violation of § 1 of the Sherman Act.  "To prove a Section 1 violation, a plaintiff must show an agreement in the form of a contract, combination [in the form of a trust], or conspiracy that imposes an unreasonable restraint on trade."  **Concord Boat Corp. v. Brunswick Corp.**, 207 F.3d 1039, 1058 (8th Cir. 2000) (alteration added).  Accord **Double D Spotting Serv., Inc. v. Supervalu, Inc.**, 136 F.3d 554, 558 (8th Cir. 1998).  See also **Masimo Corp. v. Tyco Health Care Group, L.P.**, 2006 WL 1236666, *3 (C.D. Cal. 2006) ("The elements of a Section 1 case are: (1) an agreement or conspiracy among two or more entities; (2) with the intent to unreasonably restrain competition; (3) which causes injury to competition.").  The entities must be legally distinct economic entities.  **Tops Markets, Inc. v. Quality Markets, Inc.**, 142 F.3d 90, 95-96 (2nd Cir. 1998).

"The unreasonableness of a restraint is determined using either a per se standard or a standard that examines all of the circumstances, the so-called rule of reason."  **Concord Boat**, 207 F.3d at 1058.  Examples of the per se standard include price fixing, tying arrangements, and group boycotts.  **Id.**; **Double D Spotting Serv., Inc.**, 136 F.3d at 558. "Most agreements are evaluated under the 'rule of reason,' a standard that asks whether the contract unreasonably restrains trade in a relevant product or geographic market." **Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.**, 208 F.3d 655, 659 (8th Cir. 2000).

---

[5]Contrary to Plaintiff's position, discovery in antitrust cases was cited by the Court in **Bell Atlantic** as a consideration favoring specificity in pleading.  **Id.** at 1967.

"Exclusive dealing contracts are analyzed under the rule of reason." **Id.** The application of the rule to such a contract requires consideration of "the extent to which competition has been foreclosed in a substantial share of the relevant market, the duration of any exclusive arrangement, and the height of entry barriers." **Concord Boat Corp.**, 207 F.3d at 1059. "Ultimately, the goal is to determine whether restrictions in an agreement among competitors potentially harm consumers." **Virgin Atlantic Airways Ltd. v. British Airways PLC**, 69 F.Supp.2d 571, 582 (S.D. N.Y. 1999).

Plaintiff alleges that Bard and Tyco have exclusive dealing contracts with GPOs and IDNs, conditioning discounts, rebates, and lower prices on a member hospital's agreement to purchase a specific percentage of urological catheters from them and penalizing the hospitals who purchase other, unrelated products from another vendor. Penalties take the form of requiring the rebellious hospital to pay higher prices for other urological products, expelling or threatening to expel it from the GPO, and withdrawing from it product availability, business opportunities, or financial incentives. For these allegations to state a § 1 claim, "they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." **Bell Atlantic Corp.**, 127 S.Ct. at 1966. "The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." **Id.** at 1964. It is the factual allegations, not the labels or conclusions, that "nudge" a complaint across the line from conceivable to plausible. **Id.** at 1964-65, 1974.

Plaintiff's factual allegations treat Bard and Tyco as one competitor. By doing so, Plaintiff aggregates the market power of each into a more imposing figure. Plaintiff fails, however, to allege with any specificity that Bard and Tyco have an agreement to act as one. Other allegations, i.e., Tyco's relatively small market share compared to Bard's,[6] an abandoned plan to merge the two, and a reference to "committed, sole-source, *or* dual-source exclusive contracts," do not support Plaintiff's presumption that they act as one. Nor does Plaintiff's description of a "hub and spoke" conspiracy support an inference that there was a "rim" agreement between Bard and Tyco.

As noted above, Plaintiff 's allegations "must be sufficient to establish the *inference* of conspiracy." 2 P. Areeda & H. Hovenkamp, <u>Antitrust Law</u> ¶ 307d1 (3rd ed. 2007) (hereinafter Areeda & Hovenkamp) (citing <u>Bell Atlantic Corp.</u>, 127 S.Ct. at 1965-66). And, "[a] conspiracy cannot be inferred from parallel action unless there is good reason to believe that defendants had a motive to conspire or, which is the same thing, that their behavior is interdependent." 6 Areeda & Hovenkamp ¶ 1425b (alteration added). For example, a conspiracy can be inferred from such behavior as implausible or unpredictable simultaneous parallel action, <u>id.</u> ¶ 1425c and <u>Bell Atlantic Corp.</u>, 127 S.Ct. at 1965 n.4, or from an idiosyncratic pricing system, 6 Areeda & Hovenkamp ¶ 1425e3. There is no allegation of such.

Also, there is no need to infer a conspiracy if there is an agreement to engage in common action. <u>Id.</u> ¶ 1425b. Plaintiff argues that its allegations of "actual contracts entered

---

[6]Bard's market share varies between 75 to 90%, depending on the market.

into by Tyco and Bard with GPOs" and of "independent anticompetitive agreements" and "'hub and spoke' conspiracies among GPOs . . . and Defendants" are sufficient to state a § 1 claim. (Pl. Mem. at 11, 12.) As discussed above, these allegations are insufficient to state a claim that Bard and Tyco, operating as one competitor, combined or conspired to restrain trade. See **Bell Atlantic Corp.**, 127 S.Ct. at 1966 ("A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.").

The question then is whether Plaintiff has stated a claim against Bard and Tyco as separate competitors.

Depending on the type of catheter, Bard has a 75 to 90% market share. "Market power may be shown by a firm's percentage of sales in the market, especially where there is a strong consumer preference for the firm's product (which decreases the competitive impact of substitutes) and where there are significant barriers either to the entry of new firms or to increased output by existing firms." **Ryko Mfg. Co. v. Eden Servs.**, 823 F.2d 1215, 1232 (8th Cir. 1987). "[T]here is no set percentage for how much of the relevant market must be foreclosed, [however,] it must be substantial enough that competitors are truly frozen out of a market." **Masimo Corp.**, 2006 WL 1236666 at *5 (alterations added) (interim quotations omitted). See also **Valley Liquors, Inc. v. Renfield Importers, Ltd.**, 822 F.2d 656, 666 (7th Cir. 1987) ("In both [S]ection 1 and [S]ection 2 cases, the purpose of establishing market power is to determine whether the defendant can control the market and thus affect competition. It would therefore appear that the percentages of sales necessary to

establish a substantial market share should be relatively comparable.") (alterations added).

An inference of market power may be drawn from the percentage of market share held by

Bard in the three types of urological catheters. See **Tops Markets, Inc.**, 142 F.3d at 99

(noting that, absent other considerations such as relative ease of competitive entry, an

inference of monopoly power could have been drawn from over-70 % of market share and

citing cases finding such inference in a 60 to 65% market share); **Valley Liquors**, 822 F.2d

at 666 (noting that market share analyses in Section 1 cases have found that a 70-75% market

share constitutes market power, but a 20-25% share does not); **Masimo Corp.**, 2006 WL

1236666 at *11 (finding that "rebuttable presumption of market power arises where the

defendant has 65% or more of the relevant market" and holding that jury could have

reasonable concluded that defendant who had 7% to 91% of relevant market had market

power)

Plaintiff further alleges that Bard used its market power to control the market by

combining with GPOs and IDNs to require that member hospitals buy a package of Bard's

bundled products. See **Invacare Corp. v. Respironics, Inc.**, 2006 WL 3022968, *13 (N.D.

Ohio 2006) (denying summary judgment on claim that defendant had violated Section 1 by

entering into bundling practices that forced customers to purchase one product in order to

make economically viable purchase of product that was facing competition by plaintiff);

**Masimo Corp.**, 2006 WL 1236666 at *11 (holding that jury could have reasonably

concluded that market share discounts and sole source contracts "were designed to and did

maintain monopoly power").

Moreover, these agreements are described as "long-term."  See **Paddock Publ'ns, Inc. v. Chicago Tribune Co.**, 103 F.3d 42, 47 (7th Cir. 1996) (holding that duration of exclusive dealing contract is relevant to whether contract is illegal); **Masimo Corp.**, 2006 WL 1236666 at 5 ("[E]xclusive dealing contracts [– even those requiring 100% of a customer's requirements be purchased from a single supplier –] that are terminable on short notice are not anticompetitive because foreclosure is very unlikely.")  (alterations added).

The Court notes that the question before it is whether Plaintiff's allegations against Bard state a Section 1 claim, not whether Plaintiff will prevail on that claim.  See **Jefferson Parish Hosp. Dist. No. 2 v. Hyde**, 466 U.S. 2, 15 (1984) (holding that not every offer to sell products in a package is an antitrust violation; such conduct "can merely be an attempt to compete effectively – conduct that is entirely consistent with the Sherman Act").  The Court finds the allegations sufficient to "'nudge' . . . [the] claim across the line from conceivable to plausible."  **Bell Atlantic Corp.**, 127 S.Ct. at 1974 (alterations added).

The allegations against Tyco, however, are insufficient.  Tyco's market share – 20% at best – is too little to establish any market power.  See **Masimo Corp.**, 2006 WL 1236666 at *5 (alterations added) (interim quotations omitted) (38% of market was not substantial foreclosure).  Without any specific allegations of an agreement between Bard and Tyco, Plaintiff cannot bootstrap its claims against Tyco by accumulating its market share with that of Bard.  Plaintiff's Section 1 claims against Tyco will be dismissed.[7]

_____

[7]In its response to Tyco's objections to its motion for leave to file a second amended complaint, Plaintiff states that its claims of product disparagement constitute a violation of the Sherman Act. In support of this position, Plaintiff cites **International Travel Arrangers, Inc. v. Western Airlines, Inc.**, 623 F.2d 1255, 1268 (8th Cir. 1980).  The Court notes that Plaintiff's allegations of product

Count II: Violation of § 2 of the Sherman Act.  "Section 2 of the Sherman Act prohibits 'monopoliz[ing], or attempt[ing] to monopolize . . . any part of the trade or commerce among the several States." **Concord Boat**, 207 F.3d at 1060 (quoting 15 U.S.C. § 2) (alterations in original).  "To establish a Section 2 violation, [a] plaintiff[] must show that 1) the defendant possessed monopoly power in the relevant market and 2) the defendant willfully acquired or maintained this monopoly power by anticompetitive conduct as opposed to gaining that power as a result 'of a superior product, business acumen, or historical accident.'"  **Id.** (quoting <u>United States v. Grinnell Corp.</u>, 384 U.S. 563, 570-71 (1966)) (alterations added).  <u>Accord</u> **Double D Spotting Serv., Inc.**, 136 F.3d at 560.  "Monopoly power is defined as 'the power to control prices or exclude competition.'" **Concord Boat**, 207 F.3d at 1060 (quoting <u>United States v. E.I. du Pont de Nemours & Co.</u>, 351 U.S. 377, 391 (1956)).  "[A]n attempted monopolization under Section 2 . . . requires proof of: '(1) a specific intent to control prices or destroy competition in the relevant market, (2) predatory or anticompetitive conduct intended to achieve that object, and (3) a dangerous probability of success in achieving a monopoly.'"  **Invacare Corp.**, 2006 WL 3022968 at *8 (quoting <u>Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.</u>, 920 F.Supp. 455, 465 (S.D. N.Y. 1996)) (first alteration added).  "[A] lesser degree of market power may establish an attempted monopolization claim than that necessary to establish a completed monopolization claim."  **Tops Markets, Inc.**, 142 F.3d at 100 (alteration added).

---

disparagement are directed only at Bard, and not at Tyco.

"Anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition." **Morgan v. Ponder**, 892 F.2d 1355, 1358 (8th Cir. 1989). Such conduct may include bundling rebates or giving package discounts when the customer is rewarded by a defendant for purchasing its product "B" rather than a competitor's "B" in order to receive a lower price or greater discount on the defendant's product "A", which is not produced by the competitor. **LePage's Inc. v. 3M**, 324 F.3d 141, 155-56 (3rd Cir. 2003); **Invacare Corp.**, 2006 WL 3022968, * 11. "[T]he fact that the products are sold as part of a package at a discount price[, however,] is not alone sufficient to establish the requisite tie-in." **Ortho Diagnostic Sys.**, 920 F.Supp. at 471 (alterations added). If, however, the buyer is forced by the seller's exploitation of its control over the desired product "'into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms,'" an illegal tying arrangement may exist. **Marts v. Xerox, Inc.**, 77 F.3d 1109, 1113 (8th Cir. 1996) (quoting Jefferson Parish Hosp. Dist No. 2 , 466 at 12). Such an arrangement might also exist if, "in addition to the other elements of a tying violation, . . . [the defendant's] pricing structure makes purchase of the tying and tied products together the only viable economic option." **Ortho Diagnostic Sys.**, 920 F.Supp. at 471 (alterations added).

Another example of anticompetitive conduct is predatory pricing "'in cases in which a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in.'" **Morgan**, 892 F.2d at 1358 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 n.8 (1986)). The Eighth Circuit employs two indicators when determining

whether a price is predatory.  **Id.** at 1360.  If a price is above "average total cost" – "the sum of all costs, fixed and variable, divided by total output" – it is "legal *per se*."  **Id.** at 1360, 1360 n.11.  If a price is above "average variable cost" – "the sum of all variable costs[8] . . . divided by output" – "the plaintiff must overcome a strong presumption of legality"; if a price is below average variable cost, the burden is on the defendant to show that it is not predatory pricing.  **Id.** (alteration added).  Additionally, "only price cutting that threatens equally or more efficient firms is condemned under Section 2."  **Ortho Diagnostic Sys.**, 920 F.Supp. at 469 (alteration added).

Again, Plaintiff's allegations against Bard describe a Section 2 claim.  The monopoly power that might arise from Bard's alleged market share, see **Morgenstern v. Wilson**, 29 F.3d 1291, 1296 n.3 (8th Cir. 1994) (monopoly power can be inferred from 80% market share); **Masimo Corp.**, 2006 WL 1236666 at *11 ("rebuttable presumption of market power arises where the defendant has 65% or more of the relevant market"), plus the alleged exclusive dealing contracts, plus the alleged high entry barriers, plus the harm to the urological catheter market describe a § 2 violation.  Cf. **Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.**, 2001 WL 1468168. *11-13 (S.D. N.Y. 2001) (dismissing Section 2 claims of plaintiffs who did not allege that consumers were being charged more because of defendant's conduct, that there were any entry barriers to relevant market, or that there was harm to market as a whole, and not just to any particular competitor); **Consolidated Terminal Sys., Inc. v. ITT World Commc'ns, Inc.**, 535 F.Supp. 225, 228 (D.

---

[8]"Variable costs" are "those costs that vary with output[.]"  **Morgan**, 892 F.2d at 1360 n.11 (alteration added).

N.Y. 1982) (dismissing § 2 claim because complaint had failed to allege any defendant's market share).

Plaintiff's § 2 claims against Tyco fail for the reasons set forth in the discussion above.

See **Id.** at 228-29 ("[A] shared monopoly[] does not itself violate § 2 of the Sherman Act. Rather, in order to sustain a charge of monopolization or attempted monopolization, a plaintiff must allege the necessary market domination of a particular defendant.").

Count III: Violation of § 3 of the Clayton Act. "Section 3 of the Clayton Act prohibits companies from making exclusive agreements that prevent buyers from dealing in the goods[9] of a competitor where the effect of the agreements 'may be to substantially lessen competition or tend to create a monopoly.'" **Masimo Corp.**, 2006 WL 1236666 at *3 (quoting 15 U.S.C. § 14). "Contracts imposing an obligation on a distributor to deal only in the goods of a single supplier will violate Section 3 when 'performance of the contract will foreclose competition in a substantial share of the line of commerce affected. . . . That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited. . . .'" **Ryko Mfg. Co.**, 823 F.2d at 1233 (quoting Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327-28 (1961)) (alterations in original).

Plaintiff's § 3 claims against Bard allege that Bard uses its market power to force GPOs and IDNs to enter into agreements that foreclose competition in the line of urological

---

[9]The Clayton Act does not apply to services.  See **Marts**, 77 F.3d at 1113 n. 7.

catheters.  These allegations survive the motion to dismiss.  Similar allegations against Tyco, lacking any significant market power, do not.

Count IV: Violation of Missouri's Fair Merchandising Practices Act.  Section 407.025.1 of the Missouri Revised Statutes provides, in relevant part, that "[a]ny *person* who purchases or leases merchandise primarily for *personal, family or household* purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person or a method, act or practice declared unlawful by section 407.020, may bring a private civil action . . ."  (Alterations and emphasis added.)

Plaintiff's allegations in Count IV fail because the urological catheters at issue clearly were not purchased "primarily for personal, family or household purposes."  See **Saey v. CompUSA, Inc.**, 174 F.R.D. 448, 450 (E.D. Mo. 1997) (dismissing for lack of standing the claims of an individual who purchased the product at issue for his business).

Count V: Violation of Missouri's Antitrust Law.  Section 416.031.1, Mo.Rev.Stat., "provides that '[e]very contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful.'"  A plaintiff claiming a violation of this statute "must allege that (1) defendants contracted, conspired or combined with one another; (1) [sic] the conspiracy produced anticompetitive effects within the relevant geographic and product markets; (3) the goals of the conspiracy or combination as well as the conduct in furtherance of those goals were illegal; and (4) the plaintiff suffered injury as a result of the conspiracy."  **Zipper v. Health Midwest**, 978 S.W.2d 398, 417 (Mo.Ct.App. 1998) (alteration in original).  "Section 416.031.1 is analogous to [Section 2] of the Sherman Act.  **Id.** at 418 (alteration added).  "Under directive of section 416.141 . . ., federal cases interpreting Sec. 2 control

interpretation of alleged violations of section 416.031.1." **Id.** (alteration added).

Because Plaintiff's Section 2 claims against Bard survive, so also will its Missouri antitrust claims against Bard. The claims against Tyco do not survive.

Count VI: Civil Conspiracy. "To prove a claim of civil conspiracy, the plaintiff must establish that: [1] two or more persons, [(2)] with an unlawful objective, [(3)] committed at least one act in furtherance of a conspiracy[, (4)] after a meeting of the minds[,] and [(5)] thereby damaged [the] plaintiff." **Scott v. Blue Springs Ford Sales, Inc.**, 215 S.W.3d 145, 164 (Mo.Ct.App. 2006) (alterations in original) (interim quotations omitted). "Conspiracy is not itself actionable in the absence of an underlying wrongful act or tort." **Id.** (interim quotations omitted). Accord **Oak Bluff Partners, Inc. v. Meyer**, 3 S.W.3d 777, 780-81 (Mo. 1999) (en banc). Accordingly, "[i]f the underlying claim does not state a cause of action, there can be no claim for civil conspiracy." **Zipper**, 978 S.W.2d at 417 (alteration added). Conversely, if the underlying claims – Counts I through III in the instant case – do state a claim, there may be also be a claim for civil conspiracy. Count VI against Bard survives.

Motion for Leave to File a Second Amended Complaint. Plaintiff seeks to amend its complaint to (a) add two parties as plaintiffs, Saint Francis Medical Center, a Missouri corporation, and Park Surgical Co., Inc., a New York corporation, and to change its status as representing the interests of the State of Missouri; (b) expand the temporal scope of the class definition from a period beginning on February 21, 2003 – four years before this action was filed – to the period beginning January 1999; (c) clarify the relevant product market; and (d) add a count alleging a violation of the Missouri Health Improvement Act.

"A district court should freely give leave to a party to amend its pleadings when justice so requires, Fed.R.Civ.P. 15(a); however, it may properly deny a party's motion to amend its complaint when such amendment would unduly prejudice the non-moving party or would be futile." **McAninch v. Wintermute**, 491 F.3d 759, 766 (8th Cir. 2007).  No prejudice has been found when an added claim is based on facts already known, or available to, both sides.  **Popp Telcom v. American Sharecom, Inc.**, 210 F.3d 928, 943 (8th Cir. 2000).  Prejudice has been found when the amendment would "result in the burdens of additional discovery and delay in the proceedings." **Id.**

The Court will address Plaintiff's proposed amendments in reverse order.

The Missouri Continuing Health Care Improvement Act makes it illegal for a health care provider to "knowingly make or cause to be made a false statement or false representation of a material fact in order to receive a health care payment[.]" Mo.Rev.Stat. § 191.905.1 (alteration added).  In addition to the criminal and civil penalties described in subsections 7, 11, and 12, the statute also authorizes the attorney general "to bring a civil action against any person who shall receive a health care payment as a result of a false statement or false representation of a material fact made or caused to be made by that person." Id. at § 191.905.14.

Plaintiff seeks to bring an action for a violation of the Missouri Continuing Health Care Improvement Action as relator for the State of Missouri.  An action to sue a wrongdoer on a government's behalf is a *qui tam* action.  **Stalley**, 509 F.3d at 521.  "There presently is no common-law right to bring a *qui tam* action, which is strictly a creature of statute." **Id.** (interim quotations omitted).  See also **Johnson v. Kraft General Foods, Inc.**, 885 S.W.2d

334, 336 (Mo. 1994) (en banc) ("[W]hen the legislature has established other means of enforcement, we will not recognize a private civil action unless such appears by clear implication to have been the legislative intent.") (alteration added) (interim quotations omitted). The statute at issue gives the right to file a civil action to the attorney general, not to a corporation.

Plaintiff also seeks to clarify the relevant product market. Neither defendant has alleged that it would be prejudiced by this amendment, nor is there any showing of futility.

The seminal complaint alleged a class period beginning January 1, 2002. The first amended complaint alleges a class period beginning February 21, 2003. The proposed second amended complaint alleges a class period beginning January 1, 1999. Bard objects to the expanded period.[10] Plaintiff counters that considerations of fraudulent concealment and continuing violations make the doctrine of equitable tolling applicable.

Undue delay in amending a complaint is usually an insufficient justification for the denial of leave. **Moses.com Securities, Inc. v. Comprehensive Software Sys., Inc.**, 406 F.3d 1052, 1066 (8th Cir. 2005). Accord **Doe v. Cassel**, 403 F.3d 986, 991 (8th Cir. 2005). Prejudice to the nonmovant must also be shown. **Moses.com Securities, Inc.**, 406 F.3d at 1066. And, where a party seeks to amend claims previously dismissed, unexcused delay alone may support the denial of leave. **Id.**

---

[10]Tyco also objects. Because the second amended complaint does not cure the deficiencies against Tyco, however, Plaintiff will not be granted leave to file that complaint as to Tyco. See **McAninch**, 491 F.3d at 766 (leave to amend a complaint may properly be denied where the amendments would be futile).

In the instant case, Plaintiff seeks in its second amended complaint to expand the class period after filing a first amended complaint that narrowed that period from the seminal complaint after Bard and Tyco objected to the original class period. Specifically, Plaintiff filed its complaint on February 21, 2007; in its motion to dismiss that complaint, Bard argued that Plaintiff had not alleged a cognizable basis to toll or extend the limitations period beyond the four-year period set forth in 15 U.S.C. § 15(b); Plaintiff amended its complaint in May 2007, describing a four-year period; Bard and Tyco renewed their motions to dismiss. Now, seven months after amending its complaint, Plaintiff seeks to amend it again and double the class period. This, in turn, will lead to a third round of motions to dismiss and a resurrection of an argument made in the first round. In support of its request, Plaintiff attaches a May 2005 decision of the United States District Court for the District of South Carolina permitting an antitrust plaintiff to amend its complaint a second time five months after the deadline for doing so had passed. See Spartanburg Regional Healthcare Sys. v. Hillenbrand Indus., Inc., No. 7:03-2141-HFF-BHH (D. S.C. May 6, 2005).

Plaintiff does not explain why the expanded period was abandoned and why it is being reasserted. On the other hand, Bard alleges that it will be prejudiced by the amendment given the extensive discovery already conducted and the previous briefing of two motions to dismiss. Plaintiff counters that the claims of prejudice are overstated because (a)

the discovery deadline is November 18, 2008,[11] and (b) Bard has requested documents from Plaintiff dating back to January 1998.

The Court finds, in the unique circumstances of this case, that leave to amend the complaint to expand the class period should be granted. The merits of Bard's arguments against the originally-described class period were not reached because Plaintiff voluntarily abandoned that description when filing its first amended complaint. It is not unusual for a complaint to be amended after some discovery has been conducted, and months remain before the discovery deadline is reached.

For the foregoing reasons, leave to amend the complaint will be granted only as (a) Counts I, II, III, V, and VI against Bard; (b) adding two plaintiffs; and (c) amending the class period. Leave to amend the complaint will not be granted as to Tyco and Counts IV and VII.

Accordingly,

**IT IS HEREBY ORDERED** that the motion to dismiss of Tyco International (US), Inc., and Tyco Health Care Group, L.P. [Doc. 60] is **GRANTED**.

**IT IS FURTHER ORDERED** that the motion to dismiss filed by defendant C.R. Bard, Inc., is **GRANTED** as to Count IV and **DENIED** as to Counts I, II, III, V, and VI. [Doc. 62].

---

[11]The Court notes that the amended complaint was filed within the deadline established by the case management order. The timeliness alone does not demand that leave to amend be granted. "[T]he scheduling order merely prescribes the date by which all such motions 'shall be filed'; the date on the scheduling order does not confine the district court's conclusion of the merits of such motions and does not preclude it from finding that an amendment would result in prejudice." **Moses.com Securities, Inc.**, 406 F.3d at 1066 (alteration added).

**IT IS FURTHER ORDERED** that the motion of plaintiff Southeast Missouri Hospital for leave to file a second amended complaint is **GRANTED** in part and **DENIED** in part as set forth above.

**IT IS FURTHER ORDERED** that Plaintiff file a second amended complaint consistent with this Order within ten days. C.R. Bard, Inc., is GRANTED twenty days from the date of the filing of the second amended complaint within which to file a responsive pleading.

**IT IS FINALLY ORDERED** that the claims against Tyco International (US), Inc., and Tyco Health Care Group, L.P., are DISMISSED.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of January, 2008.