UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| SOUTHEAST MISSOURI HOSPITAL and ST. FRANCIS MEDICAL CENTER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> C.R. BARD, INC., <br><br> Defendant. | Case no. 1:07cv0031 TCM |

## MEMORANDUM AND ORDER

The two named plaintiffs in this action have moved to certify their claims as a class action under Fed.R.Civ.P. 23. Plaintiffs, Southeast Missouri Hospital and St. Francis Medical Center (hereinafter collectively referred to as Plaintiffs), allege that defendant, C. R. Bard, Inc. ("Bard"), has engaged in an anticompetitive scheme that has resulted in harm to purchasers such as themselves of urological catheters. They argue that this action satisfies the prerequisites of Rule 23(a) for a class action and the criteria of Rule 23(b)(3). Bard disagrees.

### Background

The factual allegations at issue in the underlying suit have been set forth in detail in the Court's memorandums and orders of January 22, 2008, and August 27, 2008, and will be repeated here only as necessary for an understanding and resolution of the motion for class certification.

Plaintiffs contend in Count I of their second amended complaint that Bard's restraint of trade violates Section 1 of the Sherman Act, 15 U.S.C. § 1; in Count II, that its monopoly power violates Section 2 of the Sherman Act, 15 U.S.C. § 2; in Count III, that its exclusive dealing provisions violate Section 3 of the Clayton Act, 15 U.S.C. § 14; and in Count IV, that Bard's scheme violates Missouri's Antitrust Law, Mo.Rev.Stat. §§ 416.031-161.

Specifically, Plaintiffs allege that they have "purchased urological catheters produced, promoted, sold, marketed, and/or distributed by Bard." (Compl.[1] ¶ 1; see also ¶¶ 13, 14.) Urological catheters may include standard Foley catheters, infection control Foley catheters, and intermittent, or urethral, catheters. (Id. ¶ 27.) Bard has the majority share of the Foley catheter market, i.e., between 70 to 90% by dollar volume, and of the intermittent catheter market, i.e., between 60 to 70% by dollar volume.[2] (Litan Decl. ¶ 28.)

Bard allegedly engaged during this period in an anticompetitive scheme

> by using exclusionary dealing contracts, market share maintenance and compliance contracts, and penalty provisions that effectively tied other products to the purchase of its catheters purchases . . . with the intent and purpose of precluding other companies from competing in the relevant Urological Catheter Markets and leveraging its power in the Urological Catheter Markets into the markets for other products. In the face of competition from other manufacturers of Urological Catheters, . . . Bard improperly exercised its monopoly power to prevent and eliminate competition.

(Compl. ¶ 5.) These objectionable contracts were between Bard and "Group Purchasing Organizations" ("GPOs"). (Id. ¶ 16.) A GPO will negotiate the terms of purchasing

---

[1]Unless otherwise indicated, citations to "Compl." are to the second amended complaint.

[2]Bard places the figure at less than 30%.

agreements between a manufacturer and a hospital. (Pls. Mem.[3] at 6.) The hospital will then directly purchase the desired item from the manufacturer under those terms. (Id.) Some manufacturers, including Bard, will negotiate sole or dual source agreements with GPOs. (Id.) For instance, Bard has sole source contracts with two GPOs for the sale of intermittent catheters and dual source contracts with four or five GPOs.[4] (Id. at 7.) Bard also has market share maintenance requirements. (Id. at 9.) These requirements impose financial penalties on hospitals who do not maintain a certain level of purchasing. (Id.) Plaintiffs further allege that Bard has engaged in a scheme to misrepresent and disparage the infection control catheters of a competitor. (Compl. ¶¶ 46, 94, 109.)

To redress these alleged antitrust violations, Plaintiffs seek monetary, injunctive, and declaratory relief. They also seek to have two classes certified. The first class they describe as:

> All persons or entities who purchased Urological Catheters in the United States directly from C.R. Bard, Inc. ("Bard") at any time during the period January 1, 1999 through the present (and continuing until Bard ceases its anticompetitive conduct and the effects of that conduct cease) whose purchases of Bard's Urological Catheters were governed by Bard's contracts with Group Purchasing Organizations. Excluded from the Class are: Bard, Bard's parents, subsidiaries, affiliates, agents and co-conspirators; and federal governmental entities.

---

[3]The Court notes that Plaintiffs cite their second amended complaint as authority for allegations in their memorandum about GPOs and Bard's contracts with them. Allegations are not established by citation to other allegations. The ones at issue, however, are general descriptions and do not appear to be contested, at least for purposes of the instant motion, by Bard. Moreover, Plaintiffs have filed as exhibits copies of two agreements between Bard and GPOs, both of which include provisions on sole source and dual source status. (See Pls. Reply Exs. L and M.)

[4]There are seven GPOs: Novation, Premier, Consorta, MedAssets, Healthtrust, Broadlane, and AmeriNet.

(Compl. ¶ 16.) The second class is:

> All persons or entities in the State of Missouri who purchased Urological Catheters in the United States directly from C.R. Bard, Inc. ("Bard") at any time during the period January 1, 1999 through the present (and continuing until Bard ceases its anticompetitive conduct and the effects of that conduct cease) whose purchases of Bard's Urological Catheters were governed by Bard's contracts with Group Purchasing Organizations. Excluded from the Class are: Bard, Bard's parents, subsidiaries, affiliates, agents and co-conspirators; and federal governmental entities.

(Id. ¶ 17.)

Plaintiffs argue that they satisfy the prerequisites of Rule 23(a) of numerosity; commonality; typicality; and adequacy of representation. Addressing the requirements of Rule 23(b)(3), Plaintiffs argue that common legal and factual questions predominate over individual questions. Specifically, there will be common evidence on the issues of the relevant markets and market power; on the existence of contracts; and on the question whether there has been a substantial foreclosure of competition. Citing the declarations of Hal J. Singer, Ph.D., and Robert E. Litan, Ph.D., Plaintiffs further argue that a class-wide method of computing damages is feasible, applicable, and appropriate.

## Discussion

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." **Eisen v. Carlisle & Jacquelin**, 417 U.S. 156, 178 (1974). The "rigorous analysis" under this preliminary inquiry "involve[s] the consideration of what the parties must prove." **Elizabeth M. v. Montenez**, 458 F.3d 779, 786 (8th Cir. 2006). "[T]he court must look only so far as to determine whether, given the factual setting of the

case, if the plaintiffs['s] general allegations are true, common evidence could suffice to make out a prima facie case for the class." **Blades v. Monsanto Co.**, 400 F.3d 562, 566 (8th Cir. 2005). "The closer any dispute comes to the heart of the claim, the more cautious the court should be in ensuring that it must be resolved in order to determine the nature of the evidence the plaintiff would require." **Id.** at 567. "Moreover, it has long been recognized that class actions play an important role in the private enforcement of antitrust actions." **In re Vitamin Antitrust Litig.**, 209 F.R.D. 251, 258 (D. D.C. 2002). Having engaged in the required rigorous analysis, the Court finds, for the reasons set forth below, that a class action is appropriate as to some claims and one class representative.

Requirements of Rule 23(a). The prerequisites of Rule 23(a) require that the court determines:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**Elizabeth M.**, 458 F.3d at 786. Plaintiffs have the burden of showing that these and the requirements of Rule 23(b)(3) have been met. **Id.** at 785. The parties disagree about all four prerequisites.

The numerosity requirement of Rule 23(a)(1) "requires examination of the specific facts of each case and imposes no absolute limitations." **General Tel. Co. of the Northwest, Inc. v. EEOC**, 446 U.S. 318, 330 (1980). "However, a plaintiff need not specify an exact number of class members, but must only show some evidence or reasonable estimate of the

number of purported class members." **Wakefield v. Monsanto Co.**, 120 F.R.D. 112, 115 (E.D. Mo. 1988) (internal quotations omitted).

Plaintiffs cite deposition testimony estimating that there are approximately 7,000 hospitals in the United States. (Pls. Ex. 40 at 168.) They allege that approximately 96% of hospitals use a GPO to negotiate terms of purchasing agreements with various vendors and manufacturers, including Bard. Bard counters that the description of both classes requires that the hospitals be direct purchasers and Plaintiffs have not established how many of the hospitals buy directly compared to indirectly.

Considering the approximate number of hospitals and the approximate percentage that use GPOs – numbers not disputed by Bard[5] – the Court finds that Plaintiffs have satisfied the numerosity requirement. See e.g., **Paxton v. Union Nat'l Bank**, 688 F.2d 552, 561 (8th Cir. 1982) (finding that it would not be practicable to join all 74 class members "particularly because none of them, individually, could obtain the broad-based declaratory and injunctive relief that the class representatives sought," and citing cases finding classes ranging from 16, 20, 25, to 46 members satisfied numerosity requirement); **In re Genetically Modified Rice Litig.**, No. 4:06MD1811 CDP (E.D. Mo. Aug. 14, 2008) (30 named plaintiffs seeking to represent "more than" 200 others satisfied numerosity); **Morgan v. United Parcel Serv. of Am., Inc.**, 169 F.R.D. 349, 355 (E.D. Mo. 1996) (possible class of 500 satisfied numerosity

---

[5]The Court notes that, in a different context, Bard has submitted eight affidavits from hospital representatives who attest that they directly purchase Bard's urological catheters from a GPO. (Bard Exs. E, ¶ 5; F, ¶ 6; H, ¶ 11; I, ¶ 8; J, ¶ 4; K, ¶ 16; L, ¶ 15; M ¶ 8.) These hospitals are in Florida, Georgia, Louisiana, Pennsylvania, Texas, and Virginia and total fifteen. It is nonsensical to argue that Plaintiffs have not satisfied the numerosity requirement given this sampling of potential class members from five states.

requirement); **Wakefield**, 120 F.R.D. at 115 (class of approximately 397 satisfied numerosity requirement).  Cf. **Tate v. Weyerhaeuser Co.**, 723 F.2d 598, 609 (8th Cir. 1983) (potential class of 7 former employees was not so numerous as to satisfy 23(a)(1)).

Commonality under Rule 23(a)(2) "is satisfied when the legal question linking the class members is substantially related to the resolution of the litigation." **DeBoer v. Mellon Mortg. Co.**, 64 F.3d 1171, 1174 (8th Cir. 1995).  Because the "'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions," the Court will discuss the commonality requirement in the section on Rule 23(b)(3).  **Amchem Prods., Inc. v. Windsor**, 521 U.S. 591, 609 (1997).

"Typicality under Rule 23(a)(3) means that there are other members of the class who have the same or similar grievances as the plaintiff." **Alpern v. UtiliCorp United, Inc.**, 84 F.3d 1525, 1540 (8th Cir. 1996).  See also **DeBoer**, 64 F.3d at 1174 (holding that a showing of typicality is "fairly easily" made "so long as other class members have claims similar to the named plaintiff"); Alba Conte and Herbert B. Newberg, 6 Newberg on Class Actions, § 18:9  (4th ed. Supp. 2008) ("[T]ypicality refers to the nature of the claim or defense, and not to the specific facts from which it arose or the relief sought.").  Typicality is not defeated by "factual variations in . . . individual claims," including slight variations in damage calculations, "if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." **Alpern**, 84 F.3d at 1540.  Thus,

"[t]he typicality requirement can be met even though there were many products sold at varied prices and conditions . . . ." Newberg on Class Actions, § 18:9.

Additionally, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." **General Tel. Co. of Southwest v. Falcon**, 457 U.S. 147, 158 n. 13 (1982). "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." **Id.**

Both proposed classes require that a member have directly purchased Bard's urological catheters and that the purchases be governed by a contract between Bard and a GPO. Although Plaintiffs' proposed class includes a beginning date of January 1, 1999, the Court has since held that they may not assert any claims earlier than February 21, 2003. However, Southeast Missouri Hospital ("the Hospital") did not purchase any Bard urological catheters after 2001. (Bard Ex. BB at 23.) "A fundamental requirement of representatives in a class action is that they must be members of the subclasses they seek to represent." **Roby v. St. Louis Southwestern Ry. Co.**, 775 F.2d 959, 961 (8th Cir. 1985). "The representatives must 'possess the same interest and suffer the same injury' as their fellow class members." **Id.** (quoting East Texas Motor Freight Sys., Inc. v. Rodriquez, 431 U.S. 395, 403 (1977)). The Hospital is not part of the class they seek to represent; consequently, it neither possesses the same interest or suffers the same injury.

St. Francis Medical Center has an ownership interest in Novation, a GPO. (Bard Mem. at 34; Ponder Decl. ¶ 2.) As such, it would be a co-conspirator and would be excluded

from both classes. Plaintiffs counter that the dismissal of their count for civil conspiracy renders the exclusion of coconspirators in the two class definitions irrelevant. They further argue that if the exclusion is not considered irrelevant, the recourse is to strike it.

The exclusion is not irrelevant. It is included in two class definitions that are proposed for the federal and state antitrust claims, not only the dismissed civil conspiracy claim. If St. Francis Medical Center[6] ("St. Francis") wishes to proceed with this class action, the exclusions in the class definitions of co-conspirators must be deleted.[7]

St. Francis may not, however, proceed as a class representative on the claims of disparagement by Bard of the products of Rochester Medical Corporation ("Rochester"). St. Francis' representative, William Tegel, testified that Bard never did anything to disparage Rochester to St. Francis. (Bard Ex. EE at 134.) There is no evidence to the contrary. Without the Hospital as a named class representative and with St. Francis lacking standing to on the disparagement claims, those claims must either be dismissed[8] or the action must be dismissed for lack of a named class representative.

A plaintiff who lacks standing is not a member of the class; hence, that plaintiff does not satisfy either the typicality requirement of Rule 23(3) or the adequacy requirement of Rule 23(a)(4). **In re Milk Products Antitrust Litig.**, 195 F.3d 430, 436 (8th Cir. 1999). The Hospital is not a member of either class. St. Francis is only a member of the classes if

---

[6]As stated above, the Hospital cannot continue as a Plaintiff because it is not a class member.

[7]The deletion of the "co-conspirator" exclusion would also resolve Bard's argument that Plaintiffs have failed to satisfy the numerosity requirement of Rule 23(a)(1) because they have not shown how many direct purchasers of their urological catheters through GPO contracts are not co-conspirators.

[8]As discussed below, the claims of disparagement also fail under Rule 23(b)(3).

the claims of disparagement or dismissed. Lacking this dismissal, St. Francis fails to satisfy the adequacy requirement of Rule 23(a)(4).[9]

Rule 23(b)(3). In addition to satisfying the prerequisites of Rule 23(a), St. Francis[10] must satisfy one of the requirements of Rule 23(b) to maintain this class action. See **Amchem Prods., Inc.**, 521 U.S. at 614. St. Francis argues that it satisfies Rule 23(b)(3). Under this Rule, a class will be certified only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

"The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual. If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." **Blades**, 400 F.3d at 566.

There are four alleged violations of antitrust laws at issue: Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 2 of the Sherman Act, 15 U.S.C. § 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; and the Missouri Antitrust Law, Mo.Rev.Stat. §§ 416.031-161. "To

---

[9]This adequacy requirement also involves an inquiry into whether the class member's counsel "will competently and vigorously pursue the lawsuit . . . ." **Hervey v. City of Little Rock**, 787 F.2d 1223, 1230 (8th Cir. 1986). There is little dispute that class counsel satisfy this part of the requirement.

[10]Because the Hospital is not a proper named class representative, the Court will henceforth refer only to St. Francis.

prove a Section 1 violation, a plaintiff must show an agreement in the form of a contract, combination [in the form of a trust], or conspiracy that imposes an unreasonable restraint on trade." **Concord Boat Corp. v. Brunswick Corp.**, 207 F.3d 1039, 1058 (8th Cir. 2000). "To establish a Section 2 violation, [a] plaintiff[] must show that 1) the defendant possessed monopoly power in the relevant market and 2) the defendant willfully acquired or maintained this monopoly power by anticompetitive conduct as opposed to gaining that power as a result 'of a superior product, business acumen, or historical accident.'" **Id.** at 1060 (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). "Section 3 of the Clayton Act makes it unlawful 'for any person engaged in commerce, in the course of such commerce' to make tie-in sales or enter exclusive-dealing arrangements, where the effect 'may be to substantially lessen competition or tend to create a monopoly in any line of commerce.'" **Gulf Oil Corp. v. Copp Paving Co.**, 419 U.S. 186, 194 (1974) (quoting 15 U.S.C. § 14)). The Missouri Antitrust Law, Mo.Rev.Stat. § 416.031.1, is analogous to Section 2 of the Sherman Act. **Zipper v. Health Midwest**, 978 S.W.2d 398, 418 (Mo.Ct.App. 1998). Each antitrust claim requires that St. Francis establish (1) a violation of the relevant law; (2) injury and causation; and (3) damages. **In re Visa Check/MasterMoney Antitrust Litig.**, 280 F.3d 124, 136 (8th Cir. 2001).

"Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." **Amchem Prods. Inc.**, 521 U.S. at 625. The nature of the evidence relevant to establishing a violation of the antitrust laws will not vary from member to member. It is the conduct of Bard that will be scrutinized. See **In re Vitamin Antitrust Litig.**, 209 F.R.D. at 264 (rejecting defendants' arguments that individual questions, e.g., differences in manners

of purchase by class members and differences in products, would predominate over common ones, on grounds that the antitrust allegations related to the defendants' *conduct*). Bard suggests that factors such as whether the hospital-purchaser is a rural hospital, a prestige hospital, or a hospital whose staff prefers Bard's products regardless of pricing defeats class certification.[11] St. Francis counters that such considerations are not fatal given Bard's tiered pricing structure with GPOs. Under this structure, any particular member of a GPO who purchased a particular product at a particular tier level paid the same exact price. (Reply Ex. B at 7-8.) Thus, it is the average price of Bard's urological catheter products that are driven higher by Bard's conduct. Certainly, Bard might cite reasons other than anti-competitive animus for its pricing structure, its market-sharing discounts, and its bundling programs.[12] It might also argue that the tiered pricing structure cited by St. Francis is not controlling. If, however, St. Francis' allegations are true, and it has produced evidence supportive of these allegations in this preliminary inquiry, the Court agrees that the issue of whether there is an antitrust violation can be decided on evidence relevant to the class as a whole.

---

[11]The Court has carefully and thoroughly reviewed the class certification record, including competing experts' lengthy declarations; however, the Court will not discuss each and every argument made, but will discuss only those of particular relevance.

[12]For instance, Bard cites the geographical location of the hospital as requiring an individualized assessment of its pricing variations. (Its representative, James Bailey, testified that Bard's prices do not vary depending on location. See Reply Ex. D at 21-22.) According to the evidence now before the Court, St. Francis may prevail, however, only if it can establish that Bard had a tiered-pricing structure that was used to further an anti-competitive scheme. Bard also cites a movement away from infection control catheters as a reason why a competitor may be losing sales. This explanation goes to the merits of St. Francis' antitrust claims and not to the merits of its request for class certification.

St. Francis must also show that a determination of injury and causation can be established on a class-wide basis. St. Francis offers the expert opinions of Drs. Singer and Litan to support its claim that common questions of law and fact predominate over questions only affecting individual members. Summarizing the antitrust violations as Bard foreclosing rivals from the urological catheter markets and thereby raising prices on a market-wide basis by (1) "reducing rivals' shares and . . . depriving them from certain economies of scale," or (2) "directly increasing rivals' selling expenses and . . . impairing their efficiency even if rivals achieve requisite scale," Dr. Singer has developed two methods to establish the resulting harm, each method corresponding to the type of harm caused. (Reply Ex. B at 10.) The first is the new empirical industrial organization method ("NEIO") and is used to estimate prices "in a but-for world[13] given a change in seller concentration ratios." (Id.) The second, the raising-rivals'-cost model, is a method that allows an economist to estimate prices in a "but-for world given a change in rivals' costs." (Id.)[14]

Responding to Bard's contentions that neither model accommodates such factors as bargaining strength, discounts, and brand loyalty, Dr. Singer argues that these market realities would be constant in both the actual world – one in which Bard's alleged anticompetitive scheme exists – and the but-for world – one in which it does not. Dr. Litan

---

[13] A "but-for world" is one that is "free of the restraints and conduct alleged to be anticompetitive." **Blades**, 400 F.3d at 569. This hypothetical world must be constructed by an expert to establish an antitrust impact. **Id.**

[14] As discussed above, Bard's expert, Dr. Kaplan, takes issue with the worth of these models. The question now before the Court, however, is not the weight to be given the respective experts but wether St. Francis "has made a threshold showing of how [it] intend[s] to prove impact using generalized evidence on a class wide basis." **In re Vitamin Antitrust Litig.**, 202 F.R.D. at 267-68.

argues that the desire of class members to maximize their interest in the actual world would continue in the but-for world.

The court in **In re Urethane Antitrust Litig.**, — F.R.D. — , 2008 WL 4210780 (D. Kan. July 28, 2008), certified a class in an antitrust, multidistrict litigation in which plaintiffs alleged that the defendants engaged in a nationwide price-fixing conspiracy that caused them to pay more for polyether polyol products than they would absent the conspiracy. The court found that the defendants' product price lists were "evidence of standardized pricing structure, which (in light of the alleged conspiracy) presumably establishe[d] an artificially inflated baseline from which any individualized negotiations would proceed . . . [and] provide[d] generalized proof of class-wide impact." 2008 WL 4210780 at *9. Certification was also appropriate because the "most likely scenario" was that the "plaintiffs [would] be able to use a formulaic approach to damages through [the expert's testimony] with respect to some damage calculations, [although] others [might] require individualized determinations." **Id.** at *10. Moreover, "[t]he possibility that individual issues may predominate the issue of damages . . . does not defeat class certification by making this aspect of the case unmanageable." **Id.** "[C]ommon questions will govern the more difficult, threshold liability issues of proving an antitrust violation and impact." **Id.** (internal quotations omitted).

Similarly, the Court finds in the instant case that common questions of fact and law govern the issue of injury and causation. Additionally, on the record now before it, St. Francis will be able to use the formulaic approach advanced by Dr. Singer to calculate damages.

Bard argues that the reasoning of case of **Allied Orthopedic Appliances, Inc. v. Tyco Heathhcare Group, L.P.**, 247 F.R.D. 156 (C.D. Calif. 2007), commands a different conclusion. This case is distinguishable for several reasons. First, the class sought to be certified was of all direct purchasers of Tyco's pulse oximetry sensors. **Id.** at 166. Here, the classes are of direct purchasers of Bard's urological catheters when those purchases are governed by Bard's contracts with GPOs.[15] Those contracts, if St. Francis prevails in establishing its case, are governed by a tiered pricing structure; thus, an average price might be calculated. The expert's analysis was found to be conclusory and based only on a recitation of Tyco's internal documents without any meaningful investigation. **Id.** The experts' analysis in the instant case is well-reasoned and is based on an investigation of a finite subject, i.e., the tiered pricing structure for Bard's urological catheter products under the terms of its contracts with GPOs.

The satisfy Rule 23(b)(3), St. Francis must also show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). It is a superior method when it "would promote judicial efficiency and uniformity of decisions as to persons [or entities] similarly situated." **In re Vitamin Antitrust Litig.**, 202 F.R.D. at 270. The Court finds that consideration of these factors militates in favor of certification.

---

[15]Bard's expert, David P. Kaplan, Ph.D., cites purchases through individual contracts or integrated delivery networks ("IDN") as a factor why the formulaic approach of Dr. Singer will not work. The class definitions do not include such purchases.

Accordingly, the Court finds that class certification is appropriate for the antitrust violations with the exception, discussed below, of the disparagement allegations.

St. Francis also seeks class certification on its allegations of disparagement by Bard of a competitor's products. The disparagement outlined in the second amended complaint is of misrepresentations allegedly made by Bard and two GPOs to various personnel about whether Rochester's infection control catheters. (Compl. ¶ 46.) Without the allegations of conspiracy, it is Bard's misrepresentations that are at issue, and these, as described in the second amended complaint, are not subject to common proof.[16] **In re St. Jude Medical, Inc.**, 522 F.3d 836, 838 (8th Cir. 2008) (noting that cases based on misrepresentations were often unsuitable for class actions because proof varied among individuals of what representations were received). Cf. **In re Urethane Antitrust Litig.**, 2008 WL 4210780 at *10 (rejecting defendants' argument that class certification on claims of fraudulent concealment was inappropriate because it could not be established through common proof; concealment at issue was pretextual price increase announcements and inquiry would focus on defendants' acts in issuing announcements).

## Conclusion

St. Francis has carried its burden of showing that class certification is appropriate for its antitrust claims with the exception of the disparagement allegations and for the time period as previously held. Southeast Missouri Hospital has not shown that it would adequately represent the classes. Accordingly,

---

[16]Indeed, Drs. Singer and Litan propose no models that address the issue of disparagement.

**IT IS HEREBY ORDERED** that the motion of Southeast Missouri Hospital and St. Francis Medical Center for class certification is **GRANTED** in part and **DENIED** in part as set forth above. [Doc. 131]

**IT IS FURTHER ORDERED** that Plaintiffs are to file amended class definitions that comply with this Memorandum and Order within fifteen days of the date of this Order. C.R. Bard, Inc., may then file objections to such definitions within ten days of their filing. These objections are to be confined to the issue of whether the amended class definitions comply with this Memorandum and Order.

                                              /s/ Thomas C. Mummert, III
                                              THOMAS C. MUMMERT, III
                                              UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of September, 2008.